UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JODY CARR,

                    Plaintiff,

        v.

SGT. HIGGENS, CPL. HARTNETT,
C/O FLEMING, and C/O DAVIDSON,

                    Defendants.

Case No. 1:13-cv-00380-REB

**MEMORANDUM DECISION
AND ORDER**

## INTRODUCTION

Plaintiff Jody Carr, a prisoner in the custody of the Idaho Department of

Correction (IDOC), is proceeding pro se and in forma pauperis in this civil rights action.

All parties have consented to the jurisdiction of a United States Magistrate Judge to enter

final orders in this case. (Dkt. 28.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Plaintiff's cruel and unusual punishment and related retaliation claims arise from his

incarceration at the Idaho Correctional Institution - Orofino (ICI-O) in 2011. His due

process and related retaliation claims arise from his subsequent incarceration at the Idaho

State Correctional Institution (ISCI) in 2012.

Plaintiff raises these types of claims: (1) Eighth Amendment claims, for allegedly

contaminating his food with feces, against Correctional Officer Crystal Fleming,

Correctional Corporal Randy Hartnett, and Correctional Officer Kathy Davidson; (2) First

or Fourteenth Amendment retaliation claims against Defendants Fleming, Hartnett, and Davidson, for allegedly contaminating Plaintiff's food out of retaliation for Plaintiff's role in causing the prison to institute disciplinary actions against Fleming and her boss, Sergeant Roane, and for Plaintiff's prior lawsuit against Hartnett and Davidson; (3) a Fourteenth Amendment due process claim against Defendant Higgins for allegedly holding Plaintiff in administrative segregation for approximately one year without notice or a hearing; and (4) First or Fourteenth Amendment retaliation claims against Defendant Higgins for allegedly transferring Plaintiff to different prisons in response to Plaintiff's concern forms and grievances and as part of a widespread civil conspiracy to retaliate against him for engaging in litigation against other prison officials. (Dkt. 10.)

For the reasons described to follow, the Court grants Defendants' Cross-Motion for Summary Judgment for failure to exhaust administrative remedies as to Claims 1 and 2, but denies it as to Claim 4. The Court grants Defendants' Summary Judgment Motion as to the individual capacity portion of Claim 3, on qualified immunity grounds; the official capacity portion of Claim 3, on mootness grounds; and Claim 4 in its entirety, on the merits. Plaintiff's Motion for Summary Judgment is denied, and his additional motions will be denied.

## SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriate where a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal

purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct

[the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).[1] Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that

---

[1] In determining admissibility for summary judgment purposes, it is the content of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony would not be hearsay).

the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). The Court may also grant summary judgment to a non-moving party, on a ground not raised by either party, or sua sponte provided that the parties are given notice and a reasonable opportunity to respond. Fed. R. Civ. P. 56(f).

The Court does not decide credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

### DISCUSSION OF CLAIMS 1, 2, AND 4: DEFENSE OF FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

### 1. Standard of Law

The Prison Litigation Reform Act of 1995 ("PLRA")[2] requires a prisoner to exhaust all available administrative remedies within the prison system before he can include the claims in a new or ongoing civil rights lawsuit challenging the conditions of confinement. 42 U.S.C. § 1997e(a); *Cano v. Taylor*, 739 F.3d 1214, 1220-21 (9th Cir. 2014) (a claim may be exhausted prior to filing suit or during suit, so long as exhaustion was completed before the first time the prisoner sought to include the claim in the suit). "Proper" exhaustion of administrative remedies is required, meaning that the prisoner must comply "with [the prison's] deadlines and other critical procedural rules because no

---

[2] Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). The exhaustion requirement is based on the important policy concern that prison officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id.* at 204. Once in court, defendants have the right to bring motions addressing exhaustion of administrative remedies at the very beginning of litigation, and "disputed factual questions relevant to exhaustion should be decided at that time. *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc).

Failure to exhaust is an affirmative defense that may be asserted in a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim only if the prisoner's failure to exhaust is clear from the face of the complaint and any public records subject to judicial notice. *Albino*, 747 F.3d at 1166. When either party relies on evidence beyond the pleadings and public records, the exhaustion issue should be brought as, or converted into, a motion for summary judgment under Rule 56. *Id.* at 1170. "If the record is sufficiently developed to permit the trial court to consider summary judgment, and if the court finds that when viewing the evidence in the light most favorable to a moving party the movant has not shown a genuine dispute of fact on the issue of exhaustion," the Court may enter summary judgment for either the moving or the nonmoving party (on the court's own motion). *Id.* at 1176; *see* Fed. R. Civ. P. 56(f) ("After giving notice and a

reasonable time to respond, the court may . . . grant summary judgment for a nonmovant.")

Rule 56 prohibits the courts from resolving genuine disputes as to material facts on summary judgment. If a genuine dispute exists as to material facts relating to an exhaustion defense, the motion should be denied, and the "disputed factual questions relevant to exhaustion should be decided by the judge, in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue." *Id.* at 1170-71. *See also McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 184 (1936) (stating that the court may "inquire into the facts as they really exist") (internal quotation marks omitted); *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2004) (stating that the court may "hold[] an evidentiary hearing on the disputed facts"); *Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987) (stating that the court "has the discretion to take evidence at a preliminary hearing in order to resolve any questions of credibility or fact" and that the plaintiff must establish the facts "by a preponderance of the evidence, just as he would have to do at trial") (internal quotation marks omitted). The issue of "[e]xhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." *Albino*, 747 F.3d at 1170.

The defendant bears the ultimate burden of proving failure to exhaust. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that

there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.

Confusing or contradictory information given to a prisoner is relevant to the question "of whether relief was, as a practical matter, 'available.'" *Brown*, 422 F.3d at 937. Administrative remedies will be deemed unavailable and exhaustion excused if the inmate had no way of knowing the prison's grievance procedure, if the prison improperly processed an inmate's grievance, if prison officials misinformed an inmate regarding grievance procedures, if the inmate "did not have access to the necessary grievance forms within the prison's time limits for filing the grievance," or if prison staff took any other similar actions that interfered with an inmate's efforts to exhaust. *Albino*, 747 F.3d at 1173.

If a prisoner has failed to exhaust available administrative remedies, the appropriate remedy is dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled in part on other grounds by Albino*, 747 F.3d 1162.

## 2.    Material Facts

The facts material to the administrative exhaustion question are included within the following sections of this decision. The steps required to complete the IDOC Grievance Process, which are published in the prison policy manual, are undisputed. Where the facts concerning whether the exhaustion process was properly completed or whether an excuse for failure to complete the process are in dispute, the Court has so noted.

3. **IDOC Grievance Process**

There are three stages in the IDOC grievance process. First, an inmate with a concern must seek an informal resolution by filling out an offender concern form, addressed to the staff person "most capable of responding to and, if appropriate, resolving the issue." (Whittington Aff., Dkt. 30-7, ¶¶ 4-5.) If the issue cannot be resolved informally through the use of a concern form, the inmate must then file a grievance form. (*Id*., ¶¶ 4-6.)

The grievance form must be submitted within 30 days of the incident giving rise to the grievance. (*Id*., ¶ 19.) In submitting a grievance, the inmate must attach a copy of the offender concern form, showing the inmate's attempt to settle the issue informally. (*Id*., ¶ 7.) Only one issue may be raised in a grievance, and there must be "specific information including the nature of the complaint, dates, places, and names." (*Id*.) After receiving the grievance, the grievance coordinator "enters the grievance information into the Corrections Integrated System (CIS)," an electronic database used to track grievances. (*Id*. at ¶ 8.) The grievance coordinator then "assigns the grievance to the staff member most capable of responding to and, if appropriate, resolving the issue." (*Id*. at ¶ 9.) That staff member responds to the grievance and returns it to the grievance coordinator. The grievance coordinator then forwards the grievance to a "reviewing authority," usually a deputy warden. (*Id*.)

The reviewing authority reviews the grievance, including the staff member's response, and then must deny, grant, or modify the grievance. (*Id*. at ¶ 10.) The reviewing

authority returns the grievance and response to the grievance coordinator, who logs the response into the database and sends the "completed" grievance back to the inmate. (*Id.*, ¶¶ 10-12.) If the decision on an inmate's grievance is not satisfactory to the inmate, the inmate may appeal that decision. (*Id.*, ¶ 12.) Usually, the "facility head" is the person who usually decides an inmate's grievance appeal. (*Id.* at ¶ 13.)

When all three of these steps—concern form, grievance form, and grievance appeal—are completed, the administrative grievance process is exhausted. (*Id.* at ¶ 14.)

### 4. Plaintiff Did Not Exhaust Available Administrative Remedies on Claims 1 and 2

Plaintiff first filed a grievance regarding a claim that Defendants mixed human feces with his food on February 28, 2013, over a year and three months after the alleged incident occurred in November 2011. That grievance was rejected as untimely. (*Id.*, Dkt. 30-7 & Exh. D, Dkt. 30-8, p.23; Dkt. 71–5, p. 22.) It is uncontested that Plaintiff did not meet the 30-day deadline for exhausting his administrative remedies regarding that claim, or Plaintiff's companion claim that the feces incident was in retaliation for Plaintiff's exercise of his constitutional right to pursue a prior civil rights lawsuit against Defendants Hartnett and Davison. (See Whittington Aff. ¶ 19, Dkt. 30-7, reporting results of a search of the grievance database; see Case No. 3:10-cv-00625-BLW, *Carr v. Carlyn, Davidson, and Hartnett, et al.*)

Plaintiff says he did not file a grievance for these reasons:

> Defendants went past "threats" and literally did attempt to murder and/or assault Plaintiff by feeding him poisoned human feces in retaliation

for exercise of his First Amendment right to petition for redress of grievances. Thereby until the Plaintiff knew it would be more harmful to his health and risking his life more to NOT grieve the issue, he tried to keep his head down and his mouth shut, but once the Doctor informed him of two things; 1. he caught the C-Diff from being fed poop; and, 2. C-Diff is potentially fatal, the Plaintiff filed concern forms, wrote letters to Paul Panther and in appropriate time line did file Grievance.

(Dkt. 71, p. 2. (spelling regularized).)

Plaintiff's factual assertions, however, are contradicted by his own actions in the lawsuit he filed contemporaneously—Case No. 3:10-cv-00625-BLW, *Carr v. Carlyn, Davidson, and Hartnett, et al* (the "10-625 Case"). The details of that case, and the very fact that it was filed and prosecuted, make clear that Plaintiff was not "keeping his head down and his mouth shut." Rather, between December 16, 2010, when he filed the prior lawsuit against Defendants Davidson and Hartnett, and March 2012, when he asserts that he first learned from an Orofino doctor that C-Diff.[3] "came from eating infected Human Feces" (Dkt. 64), Plaintiff was busy pursuing that lawsuit, in which he alleged that Defendants had retaliated against Plaintiff for collecting evidence about a $3.5 million class action lawsuit he planned to file. Hence, any claim that Plaintiff feared for his life and therefore feared filing a grievance about the feces incident is unsupported by the record because he was already aggressively pursuing Davidson and Hartnett in a different

---

[3] "C-Diff." is short hand for clostridium difficile, a bacterium that can cause symptoms ranging from diarrhea to life-threatening inflammation of the colon. *See* http://www.mayoclinic.org/diseases-conditions/c-difficile/basics/definition/con-20029664. It is appropriate to take judicial notice of well-known medical facts. *United States v. Howard*, 381 F.3d 873, 880 & n. 7 (9th Cir. 2004).

lawsuit. In addition, Plaintiff's assertions are contrary to his own chronology of events: Plaintiff says that he had fears in November of 2011 that Defendants "went past 'threats' and literally did attempt to murder and/or assault" him, but he later claims that he did not learn the causal link between the ingesting of the feces and the potentially fatal effects of C-Diff. until four months later, in March 2012.

Plaintiff also implies that he was too ill to file a grievance. Yet, in the same time period, he was able to file numerous pleadings and papers in the 10-625 Case, including a motion for entry of default judgment, a reply to Defendants' answer, a notice of change of address, and a motion for summary judgment, all between November 2011 and the first half of 2012.

Plaintiff's assertions that he began to diligently pursue his rights once he knew that C-Diff. could be contracted from eating feces are also contradicted by the record. He did not file his grievance until February 2013. Yet, nearly a year earlier on March 17, 2012, Plaintiff wrote a letter to the state attorney general informing him that Plaintiff had contracted C-Diff. from the prison staff feeding him feces, and he demanded a settlement in the 10-625 Case.

Similarly, Plaintiff's assertions that his cause of action, or reason for filing the grievance, did not arise until he knew that he was gravely ill from eating the feces in March 2012, are flatly contradicted by other assertions in the record, including his allegations that, in November 2011, an unidentified officer approached him and informed him that other officers were putting feces in his food, and, also in November 2011, "he

became very sick and started to try to gather Evidence and Affidavits." (Dkt. 3, p. 29, 12.)

Regardless of the earliest of such allegations, and the possible connection in Plaintiffs' mind between his allegations of having been fed feces in his meals and any illness he was suffering, it is inescapable that when he learned that C-Diff. could be contracted from eating feces in March 2012, he had all the information he needed to file a grievance about the matter. Therefore, even giving Plaintiff the benefit of the doubt as to the information he already knew even before March 2012 (dating back to November of 2011), Plaintiff still did not file his grievance until February of 2013, long past the 30-day time period to do so after March 2012.

A party may not contradict himself to create a question of fact. *See Kennedy v. Allied Mutual*, 952 F.2d 262, 266 (9th Cir. 1991). Neither is the Court required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d at 1208. Because Plaintiff's arguments are contradicted by his own statements found elsewhere in the record, the Court concludes that there is no *genuine* dispute as to any material fact regarding Defendants' evidence that Plaintiff did not exhaust his administrative remedies in a timely manner. Rather, it appears that Plaintiff makes statements to suit his needs at the time, and, here, the statements that disprove his assertions came first. Neither is there any genuine dispute that Plaintiff knew how to and could have pursued a grievance in November 2011, when he allegedly learned of the feces incident, or in March 2012, when he allegedly learned the causal connection between the alleged ingestion of feces and his C-Diff. infection.

As a result, Claims 1 and 2 will be dismissed without prejudice.

**5.      Plaintiff's Failure to Grieve Claim 4 is Excused on Unavailability Grounds**

As to Claim 4, a search of the grievance database revealed no grievance addressing the claim that Defendant Higgins (or any other potential Defendant) transferred Plaintiff to different prisons in retaliation for Plaintiff's exercise of his constitutional rights. (Whittington Aff., ¶ 20 & Exh. C, Dkt. 30-8.)

However, on February 21, 2013, Plaintiff wrote a concern form about the alleged 2011 feces incident, and also complained that he had been transported five times, held in segregation in three facilities, and deprived of due process for more than a year—all the result of "a conspiracy to retaliate." (Dkt. 21-2, p. 34.) On February 24, 2013, a staff member (under Badge No. 9964) wrote in response: "We are unable to respond due to the fact that there is pending litigation. We apologize that we cannot respond." (*Id.*)

Confusing or contradictory information given to a prisoner is relevant to whether grievance relief "was, as a practical matter, 'available.'" *Brown*, 422 F.3d at 937. Here, a prison staff person informed Plaintiff that the prison could not respond to his concern form, which was the first step required of Plaintiff in the grievance procedure. Such a statement could have been interpreted as an instruction that Plaintiff should not pursue further relief through the prison grievance system. Therefore, there was no reason for Plaintiff to further pursue a grievance in those circumstances. Therefore, Defendants' motion will be denied on this claim, and the Court will consider the merits of the claim.

# CLAIM 3 AND THE QUALIFIED IMMUNITY DEFENSE

Plaintiff's due process claim alleges that:

> In April 2012, Plaintiff was transferred to ISCI prison and thrown in the Hole on either 4-24-12 or 4-26-12 and held in segregation for a year with no notice, no charges, no hearing, and no finding of guilt. for (8) eight to (9) nine months of this "year," it was 8-House (Segregation Unit), Unit Sergeant Higgens [sic] that refused to give Plaintiff a Due Process Hearing as required by I.D.O.C. policy and procedures, Idaho state law, and because liberty interests were triggered by time limit for segregation hearing of "up to 7 days."

(Dkt. 3, p. 7.)

## 1.    Standard of Law

### A.    Qualified Immunity

The doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable in the circumstances and does not violate clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). A qualified immunity analysis consists of two prongs: (1) whether the facts as alleged by plaintiff establish a violation of a constitutional right, and (2) whether that right was clearly established given the state of the law at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009), citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. The qualified immunity inquiry is "a pure question of law." *Elder v. Holloway*,

510 U.S. 510, 514 (1994).

As to the first prong, the court considers whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendants'] conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. As to the second prong, the inquiry of whether the law was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The Court must consider the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 243, quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999). If the public official can demonstrate he did not know, nor should he have known, the relevant legal standard, then qualified immunity applies. *Harlow*, 457 U.S. at 819.

B.     Due Process

The right to procedural due process of law under the Fourteenth Amendment prohibits the government from depriving an individual of a liberty or property interest without following the proper procedures for doing so. *Wolff v. McDonnell*, 418 U.S. 539, 558-66 (1974). Only claims involving a "liberty interest" are actionable. To succeed on a procedural due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process.

Although prisoners often would prefer to be housed in a specific prison over another, or in a specific part of a prison, there is no constitutional right or liberty interest

in being housed in a particular unit in prison or a particular facility. *See Meachum v. Fano*, 427 U.S. 215, 255 (1976); *McCune v. Lile*, 536 U.S. 24, 38 (2002); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

Nonetheless, a prisoner does possess a liberty interest under the federal constitution when a change occurs in confinement that imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Sandin*, the Supreme Court examined whether a prisoner had a liberty interest in not being confined in disciplinary segregation. There, the Court held that, to determine whether there is such a liberty interest, a court must analyze three factors: (1) whether disciplinary segregation was essentially the same as discretionary forms of segregation [such as administrative segregation]; (2) whether a comparison between the plaintiff's confinement and conditions in the general population showed that the plaintiff suffered no "major disruption in his environment;" and (3) whether the length of the plaintiff's sentence was affected. *Id.*, 515 U.S. at 486-87. If these factors are not met, there is no liberty interest in not being placed in disciplinary segregation, which results in a prisoner not being entitled to sue prison officials for due process violations arising from the disciplinary hearing.

The United States Supreme Court has acknowledged that "[i]n *Sandin*'s wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Brown v. Oregon Dept. of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014) (quoting *Wilkinson v.*

*Austin*, 545 U.S. 209, 223, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)). The Ninth Circuit in

*Brown* went on to determine:

> [W]e need not locate the appropriate baseline here because Brown's twenty-seven month confinement in the IMU imposed an atypical and significant hardship under any plausible baseline. Confinement in the IMU subjected Brown to solitary confinement for over twenty-three hours each day with almost no interpersonal contact, and denied him most privileges afforded inmates in the general population. While these conditions alone might apply to most solitary-confinement facilities, here there is a crucial factor distinguishing confinement in the IMU: the duration of Brown's confinement. *See Hutto v. Finney*, 437 U.S. 678, 686, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."). Brown was given a fixed and irreducible period of confinement in the IMU for twenty-seven months, in contrast to the limited period of confinement with periodic review afforded inmates in ODOC's other segregated-housing units. Retention in the ASU is limited to no more than thirty days without a hearing or status review. Retention in the DSU—where conditions of confinement generally are similar to conditions in the IMU—is limited by thirty-day assessment reviews, with the maximum period of confinement limited to six months. Brown's conditions of confinement in the IMU thus implicate a protected liberty interest under any plausible baseline.

*Id.*

However, observing that, "[u]ntil now, this court has not addressed whether the absence of post-placement periodic, meaningful review of confinement in a disciplinary-segregation unit may give rise to a protected liberty interest," the *Brown* Court applied qualified immunity based on an absence of clearly-established law governing that circumstance and upheld the district court's grant of summary judgment for the defendants. *Id.* at 989-91.

C.    <u>Other Types of Segregation</u>

The Ninth Circuit broadened application of the *Sandin* rule to include administrative segregation in the case of *Resnick v. Hayes*, 213 F.3d 443 (9th Cir. 2000). There, inmate Resnick's time in disciplinary segregation was extended and reclassified as pre-hearing administrative segregation when prison officials suspected he had committed a rule infraction while in disciplinary segregation. Resnick challenged his confinement on due process grounds.

In the original opinion, the Ninth Circuit panel affirmed dismissal of Resnick's claim, holding that he did not have a liberty interest in not being placed in segregation pending a disciplinary hearing because "such segregation falls within the terms of confinement." *Resnick v. Hayes*, 200 F.3d 641, 646 (9th Cir. 2000). However, in the amended opinion, the panel affirmed dismissal because Plaintiff failed to establish a liberty interest, having failed to allege "that his confinement, *whether administrative or disciplinary*, presented "the type of atypical, significant deprivation [that] might conceivably create a liberty interest." *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000).

Reviewing whether the conditions of segregation implicate a liberty interest requires a fact-specific, case-by-case analysis. This is illustrated, for example, in *Serrano v. Francis*, 345 F.3d 1071 (9th Cir. 2003):

> We have before us a novel situation. In the case at bar, it is not Serrano's administrative segregation alone that potentially implicates a protected liberty interest. Instead, Serrano's disability—coupled with administrative

segregation in an SHU that was not designed for disabled persons—gives rise to a protected liberty interest. That is, the conditions imposed on Serrano in the SHU, by virtue of his disability, constituted an atypical and significant hardship on him.

*Id*. at 1078-79. However, because application of *Sandin* to Serrano's situation was unique, the defendants in that case were entitled to qualified immunity.

The Second Circuit has held that a district court must review the entire time an inmate had been residing in segregation as an aggregate sum, including both administrative segregation and protective custody, and determine whether, *in toto*, the time period constituted an atypical and significant hardship. *Giano v. Selsky*, 238 F.3d 223 (2nd Cir. 2001). This view has not been adopted by the Ninth Circuit, and there has been no judicial direction from either the United States Supreme Court or the Ninth Circuit regarding whether prisoners who agree that they should be placed in protective custody are also entitled to due process protections as to the appropriateness of that placement, when that placement happens to be in administrative segregation.

**2.    *Material Facts***

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where facts are in dispute, the Court has so noted.

A.    Restrictive Housing Policy and Plaintiff's Placement

Prison policy uses the term *restrictive housing* to describe housing that separates offenders from the general population. It includes short-term and long-term restrictive housing. *Short-term* restrictive housing (less than 30 days) includes disciplinary

detention, pre-hearing segregation (PHS), segregation pending investigation (SPI) and transit. None of those situations is at issue here.

*Long-term* restrictive housing includes *administrative* segregation and *protective custody*. (Higgins Aff., ¶ 3; Burnett Aff., ¶ 9, Ex. B (Dkt. 30-11–12).) *Administrative* segregation is a form of segregation for offenders who pose a threat to life, property, self, staff or other offenders, or who threaten the secure and orderly operation of the facility. *Protective custody* (PC) is a form of administrative segregation that separates an offender from the general population for that offender's own safety. (Higgins Aff., ¶ 4; Burnett Aff., ¶ 10, Ex. B.)

The published prison policy governing protective custody housing provides that Level One PC is the highest security setting, where property available to the offender is limited to state-issued and offender personal property. Level Two PC is designed to "provide a structured transition period for those offenders preparing for integration with the general population or a less restrictive environment," and is for "those offenders that do not require the security of Level One PC." (Dkt. 30-12, p. 14.) Prisoners are allowed to have more lenient conditions of confinement and more property, as set by each facility. Policy dictates that they should have more property than Level One PC, but no more property than is permitted by the general security level of the prison in which they are housed. (*Id.*)

Plaintiff was placed in protective custody at ICI-O in March 2010 for his own safety, as he had been attacked by other inmates in the general population prior to his

placement in protective custody. (Burnett Aff., Dkt. 30-11, Ex. C (Dkt. 30-12, pp. 50-52).) On April 15, 2012, Plaintiff was transferred from ICI-O to ISCI for medical treatment. (*See* Pl.'s Exhibits at Dkt. 71-2, p. 26.)[4]

Unit 8 is the segregation housing unit at ISCI. Because of Plaintiff's protective custody status, he was housed in Unit 8 at ISCI. At ISCI at that time, Defendant Higgins was a sergeant of the correctional staff. If inmate in protective custody status at one facility was transferred to ISCI, his protective custody status would be maintained, and he would be housed in Unit 8 of ISCI. (Higgins Aff., ¶¶ 5-7.) Within Unit 8 is "C-Tier," which appears to be the lower level of protective custody, permitting a prisoner to have more property and fewer restrictions, but also potentially exposing him to a greater threat of harm.

On April 15, 2012, when Plaintiff was transferred to ISCI, it appears he was placed in the medical unit. (Dkt. 64-1, p. 9.) On April 26, 2012, Plaintiff was released from the medical unit and placed in "Tier B transit status" in Unit 8. Prison records state that this placement was due to his medical release and continuing protective custody status from ICI-O. (Dkt. 30-12, p. 39.) On April 30, 2012, Victoria Harris and Garrett Coburn, IDOC employees, classified Plaintiff as a medium-security inmate. (Dkt. 21-2, p. 33.) The "override explanation" for this classification was "Carr #79004 does not meet the placement matrix to move to a minimum custody facility." (*Id*.)

---

[4] A careful review of the shift logs shows that, of the 97 inmates in protective custody, only 13 to 17 were housed in what appears to be Level One PC. (Dkt. 60-10.) Therefore, the other approximately 80 protective custody inmates were kept elsewhere on A-Block, in what appears to be Level Two PC.

The Court takes judicial notice that ICI-O and ISCI are medium-security facilities,[5] while IMSI, the maximum security prison, has an inmate "population [that] is primarily comprised of close custody and administrative segregation."[6]

Plaintiff remained in protective custody status on the B-Tier in Unit 8 ISCI housing from April 26, 2012, until May 16, 2012. During this time, he wrote the following concern forms. On May 1, 2012, Plaintiff completed a concern form that stated: "I've had a grievance hanging out my door for a week, why won't anyone pick it up?" (Dkt. 71-2, p. 1.) There is no signature showing this form was received.

On May 5, 2012, Plaintiff completed a concern form that stated: "Hey, Sarge, 2 of your crew told me verbally their [sic] not allowed to take my concern forms because I'm on Quarantine. What's going on Boss?" (Dkt. 71-2, p. 3.) There is no signature showing this form was received.

Plaintiff was moved to C-Tier on May 16, 2012. (Dkt. 64-1, p. 9.) Plaintiff resided on C-Tier from May 16, 2012, until November 15, 2012. During his stay on C-Tier, on May 21, 2012, Plaintiff wrote to Sergeant Higgins:

> I appreciate being moved to C-Tier so I can get my property, but you said you'd help me get my grievances dealt with, you won't sign off my grievance or concern forms. You know I've always trusted you Higgins but this is a pretty serious situation.

(Dkt. 71-2, p.4.) There is no signature showing this form was received.

---

[5] See http://222.idoc.idaho/gov/content/locations/prisons.

[6] See http://222.idoc.idaho/gov/content/locations/prisons.

On June 24, 2012, and October 21, 2012, Plaintiff sent two additional concern forms to Sergeant Higgins, following up on verbal requests to be moved back to Orofino. There are no signatures showing that the forms were received. (Dkt. 71-2, pp. 4-5.)

Plaintiff was moved to A-Tier in Unit 8 on November 15, 2012. On December 4, 2012, Plaintiff wrote a concern form to Sergeant Higgins:

> I'm having my folks call the warden, I'm sorry if you end up in trouble, but I can't grieve anything because you still won't take my concern forms or grievances, I am going to grieve this "hole" time. It's been a year, and you never do what you say your [sic] gonna do. I've known you for years and think of you as a friend, but I can't live like this.

(Dkt. 71-2, p. 3.) Plaintiff stayed on A-Tier for seven additional days, until December 11, 2012, when Plaintiff was transferred to IMSI, A-Block. (Dkt. 64-1, p. 9.)

On February 4, 2013, Plaintiff was placed in transit status at IMSI in A3/145 in preparation for transport. (Dkt. 30-12, p. 39.) Plaintiff was transported to ICI-O, but ICI-O would not accept him. (Dkt. 3, p. 10.)

On February 5, 2013, Plaintiff was again placed at ISCI after being rejected at ICI-O. (Dkt. 64-1, p. 9.) On February 18, 2013, Plaintiff wrote a concern form wondering why he had never been given a hearing between April 2012 and December 2012. The answer from a sergeant stated that Plaintiff was currently in Unit 9 "to accommodate the isolation that medical (CMS) has deemed necessary." (Dkt. 21-2, p. 32.)

As previously described, Plaintiff wrote a concern form on February 21, 2013 about the alleged 2011 feces incident, and also complained that he had been transported five times, held in segregation in three facilities, and deprived of due process for more

than a year—all the result of "a conspiracy to retaliate." (Dkt. 21-2, p. 34.)

On February 27, 2013, Plaintiff wrote another concern form asking why he was in isolation for the last ten months. The response was that the officer had been mis-informed about Plaintiff being on a medical hold; rather, Deputy Warden Yordy had clarified for the officer that Plaintiff was on a security hold. (Dkt. 21-2, p. 28.) Other concern forms to other employees also showed their confusion between a medical hold and a security hold. (Dkt. 21-2.)

On March 12, 2013, Plaintiff filed a grievance complaining that he had been held in segregation for over a year with no due process. (Dkt. 21-2, p. 36.) He stated that every employee to whom he had written a concern form had a different opinion as to why he was being held in administrative segregation. (*Id*.) In his affidavit, Higgins states that, "[i]n Plaintiff's case, his placement was based on a number of factors, including but not limited to, his medical condition, his PC status and bed availability." (*Id*.)

On April 8, 2013, Plaintiff filed a grievance stating: "I want to go to the Farm or Givens Hall away from all of you NOW! Or I file suit and Lord willing retain an attorney! Enough is enough!" (Dkt. 21, p. 107.) On April 9, 2013, he was transported to IMSI, C-Block, a protective custody unit. (Dkt. 64-1, p. 9.)

Plaintiff has submitted the affidavit of inmate Charlie Smith, who states that he was a protective custody inmate with Plaintiff at ISCI. Smith declares that, as a protective custody inmate, he was given a segregation hearing every 90 days. (Smith Aff., Dkt. 64-4, p. 3.) However, there are not enough details in the record to know whether Smith was

similarly situated to Plaintiff, given Plaintiff's long-term protective custody status arising from his stay at ICI-O, and Plaintiff's history of medical issues.

During the time Plaintiff stayed at ISCI, he did not ask to have his protective custody status removed. (Higgins Aff., Dkt. 30-6, ¶ 11.) He simply wanted to be transferred to a different minimum or maximum security facility. (*Id*.)

B.     Conditions in Long-Term Segregation

IDOC's long-term restrictive housing policy calls for offenders in restrictive housing to receive the following: freedom to talk with other offenders; access to parole programs; access to prescribed medication; standard issue clothing and personal items; similar opportunities for personal hygiene, except they may be limited to three showers a week; same quality and portions of food; bedding supplies and provisions for laundry, barbering, and hair care; same opportunities for writing and receiving letters consistent with general population; exercise periods of at least one hour, five times a week; recreation outside unless weather, safety, or security considerations dictate otherwise; access to courts consistent with IDOC policy; ability to practice religious beliefs in accordance with IDOC policy; authorization to make one telephone call per month; authorization to receive one visit per month; allowance to purchase up to $50 per week of items through the commissary; and possession of personal property as listed in IDOC policy. (Burnett Aff., Ex. B., pp. 19-20.)

Plaintiff contends, however, that conditions in *administrative* segregation (protective custody) mirrored the conditions in *punitive* segregation. (Dkt. 64, p. 5.) He

states that general population conditions are much better, including the following: prisoners may make telephone calls every day from 4:30 a.m. to 10:00 p.m.; the one visit per month in segregation is behind glass with handcuffs and without access to food, while general population inmates may schedule five full-contact visits per week, and can buy fast food during visits; segregated inmates receive one ten-minute shower every two days, while general population inmates have unlimited showering dates and duration; general population inmates have a gym, recreation yard, jogging track, sports equipment, weights, basketball, pool tables, hobby craft shop access, library access, law library access, and unlimited chapel visits, while segregated inmates get one hour of recreation a day, five days a week, in an 7x7-foot cage; segregated inmates have only orange suits, while general population inmates wear jeans and button down shirts; general population inmates have jobs, schooling, programming, special events, tv, radio, fans, lamps, hot pots, sweat suits, shoes, bowls, coffee mugs, blankets, pillows, cards, games, and puzzles. Plaintiff contends that segregated inmates get none of these things. Further, he contends that general population inmates get 18 hours out of their cells seven days a week, while segregated inmates get 1 hour out of their cell (in the exercise cage) five days a week. (Dkt. 64.)

      C.     <u>Discussion of Due Process Claims</u>

     Plaintiff spent time in Unit 8 of ISCI, under Sergeant Higgins's authority, from April 15, 2012, to November 15, 2012. For all but one month of that period (from May 16 to November 15), he was housed on C-Tier, in what appears to be Level Two PC, which

is *not* the most restrictive protective custody housing. The second time Plaintiff was placed in Unit 8 of ISCI was between February 6, 2013, and April 9, 2013. Nearly all of that time (from February 8 to April 9), he was housed on C-Tier.

Various prison staff responses to Plaintiff's written inquiries show that both medical and security staff were confused regarding whether Plaintiff was on medical hold, security (PC) hold, or both, during the time period Plaintiff was housed at ISCI. Regardless of their confusion, the records are clear that Plaintiff was on security (PC) hold during the entire time, and remained so after each transfer to IMSI. The records also show that when Plaintiff became dissatisfied with ISCI protective custody, he requested a transfer, and he was then transferred to IMSI. The one time he *was* transferred back to ICI-O (his facility of choice), he was rejected at the door, because officials refused to accept him. Therefore, Plaintiff was housed at his only two remaining choices because of his medium security status—which meant he was housed at either ISCI or IMSI.

The Court will assume for these purposes, but without deciding the issue, that Plaintiff had a liberty interest in not being confined in protective custody/administrative segregation for nearly a year. However, Defendant Higgins nevertheless is entitled to qualified immunity, because there is no clearly established law that protective custody inmates must be afforded procedural due process rights when the prisoner has not contested his protective custody status. The only type of protective custody offered by the IDOC is in restrictive housing. According to policy, this restriction is designed to prevent inmates from having an incentive to claim protective custody status when they really do

not need it, because "[r]estrictive housing beds are limited in a correctional system" and, "without turnover in the restrictive housing units, there will be insufficient capacity to house new referrals." (Dkt. 30-12, p. 8.)

Plaintiff never contested his PC status. Rather, he wanted to be returned to the facility of his choice, ICI-O. Nothing in the record shows that this was a possibility. He was transferred to a more lenient custody Tier when he requested it; and he was transferred to a different prison when he requested it (to IMSI protective custody), even though it may not have been the facility of his choice. Although IMSI is a maximum security facility, its focus is on administrative segregation, within which is the protective custody category.

The Court agrees that the qualified immunity defense protects Higgins from liability for his decision to keep Plaintiff in protective custody at ISCI without hearings or reviews because of Plaintiff's long-term protective custody status and Plaintiff's lack of complaints about his dual custody status (administrative segregation/protective custody). The law is not clearly established that such a dual custody status, where an inmate agrees with a protective custody housing assignment, requires the due process protections set forth above. Plaintiff was not transferred into his dual custody status because he did something wrong; hence, the case law regarding disciplinary segregation does not necessarily fit his circumstance. When the reason for the administrative segregation ended (Plaintiff was released from the medical unit), but the reason for his protective custody remained (Plaintiff feared being injured by other inmates if placed in the general

population), there was no clearly-established case law that would have dictated to Defendants whether or what procedural due process protections should be applied to Plaintiff's circumstances, even assuming Plaintiff had a liberty interest in not being housed in administrative segregation for eight months. The law on such a nuanced aspect of prison operations remains unclear as of the date of this decision.

Accordingly, Defendant Higgins is entitled to qualified immunity. Further, nothing in the record shows that Defendant Higgins had any authority or control over Plaintiff once he was transferred to IMSI or to ICI-O. Therefore, Plaintiff has not shown a causal connection between this Defendant and the lack of due process in any other facility.

## DISCUSSION OF CLAIM 4: RETALIATORY TRANSFERS

### 1.     Standard of Law

A retaliation claim requires proof of the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, . . . that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Although a "chilling effect on First Amendment rights" is enough to state an injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of arbitrary retaliation" are insufficient to be permitted to go forward on a retaliation claim, *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985).

Significantly, federal courts should "'afford appropriate deference and flexibility'

to prison officials [when evaluating the] proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 115 S.Ct. 2293, 2299 (1995)). "Specifically, the prison administrators cannot be held liable unless their retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Vance v. Barrett*, 345 F.3d 1083, 1093 (9th Cir. 2003).

While "timing can be properly considered as circumstantial evidence of retaliatory intent," there generally must be something more than timing alone to support an inference of retaliatory intent. *Pratt*, 65 F.3d at 808. Retaliation is not established simply by showing adverse activity by defendant *after* protected speech; rather, plaintiff must show a nexus between the two. *See Huskey v. City of San Jose,* 204 F.3d 893, 899 (9th Cir. 2000) (a retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc,* i.e., "after this, therefore because of this").

## 2.     Plaintiff's Retaliatory Transfer Claim

Plaintiff alleges that Defendant Higgins transferred him to IMSI in December 2012, in response to his concern forms and grievances and as part of a widespread civil conspiracy to retaliate against Plaintiff for engaging in litigation against other prison officials. (Dkt. 3, p. 9; Dkt. 21-2, p. 34.) During this time period, Plaintiff says he would try to get Defendant Higgins to come by his cell and pick up his concern forms and grievances, but that Higgins would refuse to do so. Plaintiff claims that Higgins transferred Plaintiff to IMSI in December 2012, when Plaintiff filed more concerns and

grievances. (*Id.*, p. 10.) Plaintiff also alleges that Higgins was part of a conspiracy involving many prison officials and different facilities, all of whom were angry about Plaintiff suing prison employees. Plaintiff also alleges that Higgins was responsible for five prison transfers involving Plaintiff during this time period.

The facts and analysis above, however, do not support an inference that Plaintiff's two prison transfers from ISCI to IMSI were retaliatory transfers. Of significance, (1) Plaintiff himself requested to be transferred to a different prison, (2) Plaintiff did not request a change from protective custody status, and (3) the record does not reflect any other option for Plaintiff, except IMSI. The context underlying Plaintiff's retaliation claim is that Plaintiff actually requested a transfer, and there is no sufficient evidence that other institutions had open bed space in protective custody to which he could have been transferred and that would have accepted him as an inmate. In that context, Plaintiff's retaliation claim fails for lack of causation and because his transfer served a legitimate penological reason—the prison was able to accommodate an inmate's request for transfer out of an institution where he did not want to be and into a new environment and maintain the continuity of his protective custody. Plaintiff had no right to be transferred to the facility of his choice *and* he did not want to remain at ISCI. The fact that he was not placed in the facility of *his* choice does not make retaliatory a transfer that originated with his own request.

Further, there is no evidence in the record supporting a claim that Defendant Higgins or other prison officials were involved in a widespread conspiracy or had a

retaliatory intent when they transferred Plaintiff to different housing assignments. There is no evidence in the record why ICI-O refused to accept Plaintiff as an inmate when his medical treatment was completed, and particularly none to show that Sergeant Higgins had anything to do with the refusal of ICI-O to accept Plaintiff.

This assessment is entirely consistent with applicable Ninth Circuit law, as recently explained in *Wood v. Yordy*, 753 F.3d 899 (9th Cir. 2014):

> We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient. *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *see also McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (specific evidence of retaliation required). There is nothing in the record to indicate [the first defendant] even knew about the earlier suit. There is similarly no evidence to show that [the second defendant] knew about the earlier suit or other evidence suggesting that the claimed harassment by [him] was in retaliation for the earlier suit. The district court correctly granted summary judgment against Wood on the retaliation claim.

*Id.*, 753 F.3d 899, 905. The same is true in this case; there is insufficient evidence showing any link between Higgins and the prior lawsuit.

## OFFICIAL CAPACITY CLAIMS

Plaintiff also brings claims against Defendants Fleming, Hartnett, and Davidson in their official capacity. (Compl., ¶ 6.) A claim against a state actor "in his or her official capacity" is considered a claim against the state, and the Eleventh Amendment's jurisdictional bar to states and state entities applies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Therefore, claims for money damages against state actors in their official capacity are prohibited by Eleventh Amendment immunity. *See*

*Hafer v. Malo*, 502 U.S. 21, 2658, 362 (1991).

However, the Eleventh Amendment does not bar suits for prospective injunctive relief filed against state officials. *Ex Parte Young*, 209 U.S. 123, 157-58 (1908). A plaintiff may name as defendants officials who have direct responsibility in the area in which the plaintiff seeks relief. *See Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1036 (9th Cir. 1999).

Nonetheless, any injunctive relief claims arising from Claims 1 and 2 are dismissed as a result of Plaintiff's failure to properly exhaust prison administrative remedies. Similarly, because Claim 4 is denied on its merits, so is any request for injunctive relief arising from this claim. As to Claim 3, qualified immunity does not apply to claims for prospective injunctive relief, only claims for monetary damages. However, the Court concludes that Plaintiff's requested remedy— "to house him in the Idaho minimum security prison of his choice" (Dkt. 3, p. 34)—is not an available remedy.

The PLRA limits the type of prospective relief available in prison conditions lawsuits brought under 42 U.S.C. § 1983. Importantly here, the term "prospective relief" is defined as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). Particularly, 18 U.S.C. § 3626(a)(1)(A) limits such relief as follows:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the

violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

The record reflects that IMSI prison officials (who are not defendants in this action) are now providing Plaintiff with review hearings for his protective custody status (Dkt. 30-12, pp. 31-32), and, if they were not, that is all the relief Plaintiff would be due. Plaintiff cannot dictate his housing placement to prison officials. Prison housing assignments are functions wholly within the discretion of the prison administration. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Meachum v. Fano*, 427 U.S. at 225.

In addition, Plaintiff has not sued anyone who could provide Plaintiff his desired relief, because he no longer resides at ISCI. Even if the Court permitted a second amendment of the Amended Complaint to include an IMSI official, the Court could order no more due process than Plaintiff is currently receiving. Therefore, Defendants are entitled to summary judgment on the official capacity claims for prospective injunctive relief on grounds of mootness.

## PLAINTIFF'S MOTION TO AMEND (Dkt. 19) AND REVIEW OF AMENDED COMPLAINT

On February 24, 2014, Plaintiff filed a Motion to Lodge an Amended Prisoner's Civil Rights Complaint to bring additional claims against Defendants Warden Randy Blades, Deputy Warden Yordy, Deputy Warden Coburn, Sergeant Mechtel, and IDOC.

(Dkt. 19.)[7] For the reasons that follow, Plaintiff will not be permitted to amend his Complaint. He may bring the claim against Sergeant Mechtel in a new complaint, if he chooses to further pursue such a claim.

1.    **Due Process Claims**

Plaintiff brings allegations of a due process violation against Defendant Warden Blades and Defendant Deputy Warden Yordy. (Dkt. 20, pp. 16-18.) These allegations center on his transfers to and from various facilities and responses to grievances from Warden Blades and Deputy Warden Yordy. In response to Plaintiff's inquiry complaining of lack of due process, Warden Blades responded that Plaintiff was currently housed in Unit 8 to ensure that he was kept safe and could obtain medical care. Plaintiff also alleges that Deputy Warden Yordy responded to one of Plaintiff's grievance forms inquiring about why he was being transferred to IMSI by stating that the medical unit had authorized Plaintiff to be housed at IMSI.

These due process claims are subject to the same qualified immunity analysis discussed above, leading to the same conclusion. Hence, the amendment would be futile.

2.    **Retaliatory Transfers**

In his Amended Complaint, Plaintiff seeks to amend his allegations supporting his retaliatory transfer claim to include as defendants Warden Blades, Deputy Warden Yordy,

---

[7] On June 26, 2014, Plaintiff filed a supplement to his motion to amend, raising new claims against Defendants' counsel and other individuals. His supplement is rambling and vague, which is adequate reason to deny his request. (Dkt. 58.) Because Plaintiff was well beyond the three-motion limit imposed in this case, this motion will be stricken. Plaintiff is warned that abusive litigation tactics and disregard for court orders in the future may bring additional consequences, such as sanctions.

and Deputy Warden Coburn. (Dkt. 20, pp.21-23.) These claims fail for the same reason his claim against Sergeant Higgins fails. Plaintiff has provided no facts supporting his allegation that any transfer was retaliatory; rather, the record shows that the transfers were an appropriate response to Plaintiff's own request to be moved from ISCI and that IMSI is a facility designated for close custody and administrative segregation inmates. As noted above, there is no evidence in the record that prison officials were involved in a widespread conspiracy against Plaintiff. Because amendment would be futile, Plaintiff will not be permitted to add these new claims.

3.      **Claim Against IDOC**

The claim for failure to train and for any other alleged constitutional violations against the IDOC must be dismissed because the claims seeks monetary relief from a defendant immune from such relief. There can be no actionable claim for damages against IDOC, an executive department of state government, because the state of Idaho and IDOC as a dependent agency are immune from § 1983 damages claims under the Eleventh Amendment. See *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 70 (1989); *Leer v. Murphy*, 844 F.2d 628, 632 (9th Cir.1988) (holding that, as part of the state, IDOC is immune from a suit for damages under § 1983.)

3.      **Retaliation Claim Against Mechtel**

Plaintiff alleges a retaliation claim against Sergeant Mechtel. While housed at IMSI in September of 2013, Defendant Mechtel issued two Disciplinary Offense Reports

(DORs) to Plaintiff. (Dkt. 20, pp. 27-30.) These DORs stemmed from letters that Plaintiff wrote to Defendant Fleming. (Dkt. 21, pp. 4-5.) The DORs describe letters sent by Plaintiff to Fleming, stating that Plaintiff was attempting to resolve his claims by letter, that he had evidence Fleming put "poop" in his food, and that the ACLU said he had a "slam dunk" case, and containing a list of demands including that, "the only way to save all involved is if I get transferred to Givens Hall NOW!" Mechtel concluded the letter was harassing in nature. (*Id.*) In his Amended Complaint, Plaintiff alleges that he was attempting to "informally resolve" his case as the Court instructed he may do in its Order of Conditional Filing (Dkt. 4) which provides that Plaintiff may "do informal tasks, such as attempting to resolve your claim with the other party by letter." Plaintiff alleges that the DORs are retaliation for exercising his First Amendment Rights by attempting to informally resolve his claims. Plaintiff's letters to Fleming are not in the record.

The required elements of a retaliation claim are the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, . . . that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d at 567-68.

The Ninth Circuit has previously held that disrespectful language in a prisoner's grievance is itself protected activity under the First Amendment. *Bradley v. Hall*, 64 F.3d 1276, 1281–82 (9th Cir.1995), *abrogated on other grounds in Shaw v. Murphy*, 532 U.S. 223 (2001). In *Bradley*, the Ninth Circuit held that "prison officials may not punish an

inmate merely for using 'hostile, sexual, abusive or threatening' language in a written grievance." The *Bradley* decision was subsequently criticized by the Supreme Court in *Shaw v. Murphy*, 532 U.S. 223, 230 n. 2 (2001). In *Shaw*, the Supreme Court disapproved of that portion of the Ninth Circuit's analysis in *Bradley* where it "balance[d] the importance of the prisoner's infringed right against the importance of the penological interest served by the rule," when it found that, as applied to the content of formal written grievances, the rule impermissibly "substantially burdened" prisoners' right of access to the courts. *Shaw*, 532 U.S. at 230–31 citing 195 F.3d 1121, 1127 (9th Cir. 1999) (quoting *Bradley v. Hall*, 64 F.3d 1276, 1280 (9th Cir. 1995)). The Supreme Court concluded that *Turner* does not permit increasing constitutional protection based on the content of the communication because the holding in *Turner* does not allow for valuations of content. *Shaw*, 532 U.S. at 230–31 (citing *Turner v. Safley*, 482 U.S. 78 (1987) (emphasis added). "On the contrary, the *Turner* factors concern only the relationship between the asserted penological interests and the prison regulation." *Id.*, 532 U.S. at 230.

The Supreme Court in *Shaw* instructs that the court's focus must be content neutral. Prison officials are to remain the primary arbiters of the problems that arise in prison management. If courts were permitted to enhance constitutional protection based on their assessments of the particular communications, courts would be in a position to assume a greater role in decisions affecting prison administration. *Turner*, 482 U.S. at 89.

Even so, while it appears that Plaintiff's claims would fail under a *Turner* analysis, that decision is best left to summary judgment. Because this case is at its end, the Court

will not permit amendment. However, Plaintiff may bring this particular claim in a different lawsuit if he desires.

## PLAINTIFF'S OTHER PENDING MOTIONS

Plaintiff has exceeded the Court's Order (Dkt. 39) that he is not allowed to have more than three pending motions at one time, and the remainder of his motions will be denied as moot, except the motion to file a supplement (Dkt. 70), which will be granted. The Court notes that many of these motions are superfluous and repetitive.[8]

## CONCLUSION

For the reasons described in this decision, the Court will grant Defendants' Cross-Motion for Summary Judgment:

(1) on Claims 1 and 2, for failure to exhaust administrative remedies;

(2) on the individual capacity portion of Claim 3, on qualified immunity grounds;

(3) on the official capacity portion of Claim 3, on mootness grounds; and

(4) on Claim 4, the retaliation claim, on the merits.

Plaintiff's Motion for Summary Judgment will be denied, along with his additional motions.

---

[8] For example, Plaintiff has four motions seeking transfer to another prison facility. Additionally, he has two motions addressing the removal of defense counsel, Andrew Brassey, from the case (Dkts. 55, 56.)

**ORDER**

**IT IS HEREBY ORDERED:**

1.      Plaintiff's Motion for Reconsideration (Dkt. 18), Ex parte Motion (Dkt. 40), Ex parte Motion (Dkt. 48), Sealed Motion (Dkt. 49) are **DENIED;**

2.      Plaintiff's Motion to Amend (Dkt. 19) is **DENIED.** If Plaintiff chooses to further pursue his claim against Mechtel, he may do so in a different lawsuit;

3.      Plaintiff's Motion for Summary Judgment (Dkt. 27) is **DENIED;**

4.      Defendants' Motion for Summary Judgment with Supplement (Dkt. 30, 43) are **GRANTED**, to the extent set forth above;

5.      Plaintiff's Motion to Consolidate Cases (Dkt. 41) is **DENIED;**

6.      Plaintiff's unauthorized motions (Dkt. 44, 51, 55, 56, 57, 58) are **DENIED** as moot.

7.      Plaintiff's Motion to File Supplement (Dkt. 70) is **GRANTED** and was considered by the Court; Defendants' Motion to Strike Supplement (Dkt. 73) is **DENIED.**

8.      Claims 1 and 2 are **DISMISSED** without prejudice. Claim 3 is **DISMISSED** with prejudice as to the individual capacity portion of the claim, and **DISMISSED** as moot as to the official capacity portion of the claim. Claim 4 is **DISMISSED** with prejudice.

DATED: **September 5, 2014**



_____
Honorable Ronald E. Bush
U. S. Magistrate Judge